**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
Max S. Roberts (*Pro Hac Vice* Forthcoming)
Victoria X. Zhou (*Pro Hac Vice* Forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: pfraietta@bursor.com
         mroberts@bursor.com
         vzhou@bursor.com

**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: jwilner@bursor.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SELBY, SUNGIL HONG, LAURA BONETTI, JANE DOE, and KIRSTIE SEMIEN, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>SOVRN HOLDINGS, INC,<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

PAGE

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES ................................................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 2

FACTUAL ALLEGATIONS ............................................................................................. 2

I.    DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION
      ECONOMY ............................................................................................................. 2

      A.    Data Brokers ............................................................................................... 3

      B.    Real-Time Bidding ...................................................................................... 6

      C.    Cookie Syncing ......................................................................................... 11

II.   OVERVIEW OF DEFENDANT'S SERVICES ................................................... 14

      A.    The Lijit Pixel ........................................................................................... 14

            1.    Persistent Identifiers ...................................................................... 16

                  (i)     Cookies .............................................................................. 16

                  (ii)    IP Addresses ...................................................................... 18

                  (iii)   Mobile Advertising Identifiers ......................................... 21

                  (iv)    Other Identifiers ............................................................... 26

            2.    Universal Resource Locator ........................................................... 26

            3.    Identity Resolution ......................................................................... 27

      B.    Sovrn's Ad Exchange (SSP) ..................................................................... 29

III.  THE LIJIT PIXEL IS PRESENT ON EACH OF THE SUBJECT WEBSITES ............... 30

      A.    Buzzfeed ................................................................................................... 31

      B.    Bon Appetit ............................................................................................... 32

      C.    MindBloom ............................................................................................... 35

      D.    Zillow ........................................................................................................ 38

      E.    AliExpress ................................................................................................. 40

IV.    DEFENDANT'S    SERVICES    DEANONYMIZE    USERS    AND    ENRICH DEFENDANT, WEBSITE OPERATORS, AND PARTNER PIXELS ALIKE THROUGH REAL-TIME-BIDDING AND PROFILING INDIVIDUALS ...................... 42

    A.    Defendant Combines The Data From All The Subject Websites With Other Data To Deanonymize Users ........................................................... 42

    B.    The Partner Pixels Use The Profiles Created By Defendants To Enhance Their Advertising And Analytics Services ................................. 43

V.    PLAINTIFFS' EXPERIENCES ........................................................................ 44

    A.    Plaintiff Michael Selby ........................................................................ 44

    B.    Plaintiff SungGil Hong ........................................................................ 45

    C.    Plaintiff Laura Bonetti ........................................................................ 46

    D.    Plaintiff Jane Doe ................................................................................ 48

    E.    Plaintiff Kirstie Semien ...................................................................... 49

CLASS ALLEGATIONS .............................................................................................. 51

CAUSES OF ACTION .................................................................................................. 53

    COUNT I .......................................................................................................... 53

    COUNT II ......................................................................................................... 54

    COUNT III ........................................................................................................ 57

    COUNT IV ........................................................................................................ 59

    COUNT V .......................................................................................................... 61

PRAYER FOR RELIEF ................................................................................................ 63

JURY TRIAL DEMANDED ......................................................................................... 63

Plaintiffs Michael Selby, Sungil Hong, Laura Bonetti, Jane Doe, and Kirstie Semien ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Sovrn Holdings, Inc. ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegation specifically pertaining to themselves, which are based on personal belief.

## NATURE OF THE ACTION

1.     This class action lawsuit sets forth how the business practices of Sovrn Holdings, Inc., ("Defendant" or "Sovrn") amounts to a deliberate surveillance of millions of Americans through their activity on the Internet and mobile applications. Sovrn, through its software products, tracks in real time and records indefinitely the personal information and specific web activity of hundreds of millions of Americans.

2.     This unlawfully collected information is worth billions of dollars to Defendant because it makes up the content of Defendant's Omnichannel Advertising platform and Ad Exchange, and creates individual sales of advertisements in the real-time-bidding ecosystem present on thousands of major websites where Defendant's services are installed.

3.     Plaintiffs bring this action to enforce their constitutional rights to privacy and to seek damages under California law for the harm caused by the collection and sale of their confidential data and personal information.

## THE PARTIES

4.     Plaintiff Michael Selby is a natural person and citizen of California, residing in Antioch, California.  Plaintiff Selby was in California when he accessed the Zillow website and had his activity on that website and subsequent activity on other websites tracked by Defendant.

5.     Plaintiff SungGil Hong is a natural person and citizen of California, residing in San Diego, California. Plaintiff Hong was in California when he accessed the AliExpress website and had his activity on that website and subsequent activity on other websites tracked by Defendant.

6.     Plaintiff Laura Bonetti is a natural person and citizen of California, residing in Venice, California. Plaintiff Bonetti was in California when she accessed the Bon Appetit website and had her activity on that website and subsequent activity on other websites tracked by Defendant.

7.      Plaintiff Jane Doe is a natural person and citizen of California, residing in Milford, California. Plaintiff Doe was in California when she made a purchase on the Mindbloom website and had her activity on that website and subsequent activity on other websites tracked by Defendant.[1]

8.      Plaintiff Selby Sifers is a natural person and citizen of California, residing in Hayward, California.  Plaintiff Dilara Uskup was in California when he accessed the Zillow website and had his activity on that website and subsequent activity tracked by Defendant.

9.      Defendant Sovrn Holdings, Inc., is a Colorado corporation with its principal place of business at 1600 Pearl St, Boulder, CO 80302. Lijit is wholly owned by Sovrn Holdings, and Sovrn uses the Lijit Pixel to accomplish widespread surveillance alleged herein, and has access to all information collected by the Lijit Pixel.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

11.      This Court has personal jurisdiction over Defendant because Defendant collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

**I.      DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY**

13.      To put the invasiveness of Defendant's privacy violations into perspective, it is important to understand three concepts: data brokers, real-time bidding, and cookie-syncing.

---

[1] Because Plaintiff Doe accessed the Mindbloom website, which provides ketamine therapy, and ketamine is a Schedule III drug pursuant to the Controlled Substances Act (21 U.S.C. §§ 801, *et seq.*), Plaintiff Doe's name has been anonymized to protect her privacy.

## A.    Data Brokers

14.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[2] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

15.    Any entity that qualifies as a "data broker" under California law must specifically register as such (Cal. Civ. Code § 1798.99.82(a)), which Sovrn[3] does.

16.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[4]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."  And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[5]

17.    For instance, as a report by NATO found, data brokers like Defendant collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited.  Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do.  On top of this, "[b]rokers typically

---

[2] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.

[3] DATA BROKER REGISTRATION FOR SOVRN INC, INC., https://oag.ca.gov/data-brokers?combine=sovrn.

[4] SHERMAN, *supra*, at 2.

[5] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[6]

18.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[7]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[8]

19.    This data collection has grave implications for Americans' right to privacy.    For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[9]

20.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminatorily target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

---

[6] Henrik Twetman & Gundars Bergmanis-Korats, NATO Strategic Communications Centre Of Excellence, Data Brokers And Security at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[7] Sherman, *supra*, at 1.

[8] *Id.*

[9] *Id.* at 9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[10]

21.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[11]



22.    Data brokers like Defendant are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers

---

[10] *Id.*

[11] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

like Defendant to track users across the Internet.[12]  Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[13]

23.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you.  They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[14]

24.    In short, data brokers like Defendant track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

**B.    Real-Time Bidding**

25.    So, once data brokers like Defendant collects information from consumers and create comprehensive user profiles, how do Defendants "sell" or otherwise monetize that information?  This is where real-time bidding comes in.

26.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[15]

27.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP "work[s] with website or app publishers to help them participate in the RTB process."  "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they

---

[12] *Id.* at 11.

[13] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[14] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[15] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

---

put forth."[16]    And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[17]

28.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

29.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[18]

//

//

//

//

//

//

---

[16] Geoghegan, *supra*.

[17] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[18] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.



30.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for website and app operators' users.  But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendants:

> the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data broker, like Defendants].  DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[19]



---

[19] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

31.    In other words, before bidding to show a user an advertisement, SSPs and DSPs will attempt to determine what other information about a user may be available.  SSPs and DSPs do this by connecting with entities like Defendants, who match a consumer's information from a particular website or mobile application (*e.g.*, their IP address) with any profiles on those users Defendant may have compiled.  If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information to base their targeting on.  This naturally enriches website and app operators, as their users are now more valuable.  It also enriches SSPs who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users.  And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

32.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

    (a)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

    (b)    "send[ing] sensitive data across geographic borders."

    (c)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[20]

33.    The last point bears additional emphasis, as it means the data Defendant provides to DSPs to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer.  This greatly diminishes the ability of users to control their personal information.

---

[20] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

34.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[21]

35.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[22]:



36.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

---

[21] Geoghegan, *supra*.

[22] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

**C.  Cookie Syncing**

37.    It should now be clear both the capabilities of data brokers like Defendant who de-anonymize users, and the reasons that Defendants' technology is installed on websites (to provide more information to advertisers in real-time bidding.  The final question is how do Defendants share information with other services to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

38.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[23] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[24]

39.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com.  However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

> …

> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled

---

[23] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[24] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

---

advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[25]



40.      Through this process, third party trackers like Defendants' are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[26]

41.      On the flip side, "CSync may re-identify web users even after they delete their cookies."[27] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[28] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync,

---

[25] Papadopoulos, *supra*, at 1433.

[26] Papadopoulos, *supra*, at 1434.

[27] *Id.*

[28] *See id.*

all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[29]

42.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[30]

43.    Cookie syncing is precisely what is happening here.  When Defendant's Pixels are installed on users' browsers, they are syncing their unique user identifiers with other third parties on the websites (*e.g.*, the Partner Pixels listed below).  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from being anonymous when they visit websites.

\*        \*        \*

44.    To summarize the proceeding allegations, Defendant is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles. Through "cookie syncing," those profiles are shared by Defendant with other entities (and vice versa) to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interest advertisers through real-time bidding, where users will command more value the more advertisers know about a user.  Thus, Defendants enrich the value that website users would otherwise command by tying the data they obtain directly from users on websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

45.    Accordingly, Defendant is using its tracking technology in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and (iii) allow website operators to monetize websites by installing Defendant's Pixels and allowing the Defendant to collect as much information about users as possible (without consent).

46.    Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant

---

[29] *Id.*

[30] *Id.* at 1441.

can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

47.     As it stands though, Defendant is already one of the largest players in this industry. Defendant achieved this status using a variety of technologies and services, as described below.

## II.     OVERVIEW OF DEFENDANT'S SERVICES

48.     Defendant Sovrn, formerly known as Lijit Networks, Inc., as noted above, is a registered data broker in California and is headquartered in Boulder, Colorado.

49.     Lijit, a programmatic advertising company, was acquired by Federated Media Publishing in 2011.[31] In 2014, Federated Media rebranded its programmatic ad business as Sovrn Holdings.[32]

50.     Despite the rebrand, every Sovrn programmatic advertising service is still operated using the Lijit.com domain.[33] This domain "handles all network requests to the Sovrn Ad Exchange" and the Sovrn third-party advertising cookie references Lijit.com.[34]

51.     "All Sovrn programmatic advertising partners call the Lijit.com domain for their advertising needs" (such as cookie syncing).[35]

52.     Lijit was co-founded by Todd Vernon and Stan James with the explicit intention of developing technology that would "to help online publishers of all sizes sell their unsold ad inventory."[36] Defendant achieves its this by partnering in with third party providers[37] and the use of its products.

### A.     The Lijit Pixel

53.     Defendant Sovrn oversees a massive web of online tracking technologies that provide ongoing information to Defendant.

---

[31] https://knowledge.sovrn.com/kb/what-is-the-lijit-ad-serving-domain

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] https://www.sovrn.com/privacy-policy/third-parties/

[37] https://www.venturebanc.com/boulder/angels/todd-vernon (March 5, 2025).

54.     The collection of this highly detailed information relies on a series of "pixels" and "Ad Tags" (collectively described as the "Lijit Pixel") loaded onto websites.  A pixel is a piece of code that website operators can integrate into their websites to "tracks the people and type of actions they take."[38]  An ad tag "is a chunk of code inserted within your domain that sends a request to the ad server to show an ad in a given place (i.e. Ad Placement). Publishers, advertisers, and ad networks use ad tags to exchange data with each other." [39]

55.     Sovrn collects information on Internet users' activity on a wide variety of websites through the use of the Lijit Pixel it owns and develops. The advertisers that Sovrn partners with have their own pixels (the "Partner Pixels"), which are embedded into website designs. To support the identity resolution process (detailed below), these pixels trigger (load) Sovrn's pixels on the website, enabling more effective ad targeting and measurement.

56.     Plaintiffs' testing has revealed Defendant working with dozens of Partner Pixels, but there are likely many more.

| Ad Tech Entity | Role | How to Identify |
|---|---|---|
| sync.kueezrtb.com | DSP | "rtb" (real-time bidding) suggests it's on the **buy-side**. DSPs participate in RTB to bid on ads. |
| nextmillmedia.com | SSP | The presence of **cookie syncing** suggests it collects data for publishers. SSPs sync users for selling inventory. |
| sync.a-mo.net | DSP | The use of "sync" and "setuid" suggests **buyer-side** user ID matching, typical for DSPs. |
| google-bidout-d.openx.net | SSP (OpenX) | "bidout" means OpenX is offering bids to buyers, indicating it's an **SSP**. |
| prebid-server.rubiconproject.com | SSP (Rubicon) | "prebid" is a **server-side header bidding mechanism**, meaning Rubicon is an **SSP**. |
| hbopenbid.pubmatic.com | SSP (PubMatic) | "hbopenbid" suggests **header bidding**, which is an **SSP** feature. |
| grid.bidswitch.net | SSP/Exchange | Bidswitch is an **ad exchange**, which acts as a bridge between DSPs and SSPs. |
| fastlane.rubiconproject.com | SSP (Rubicon) | "Fastlane" is Rubicon's **header bidding solution**, meaning it's an **SSP**. |
| vad-bid.adsrvr.org | DSP (The Trade Desk) | "adsrvr.org" is a known domain for The Trade Desk DSP. |
| match.adsrvr.org | DSP (The Trade Desk) | Again, "adsrvr.org" suggests a DSP **that's buying ads.** |
| pagead2.googlesyndication.com | DSP (Google Ads/Google DV360) | Google's **display ad system** (DV360 is its main DSP). |
| cm.g.doubleclick.net | DSP (Google DV360) | Cookie matching suggests Google's DSP needs to recognize users. |

---

[38] https://www.facebook.com/business/goals/retargeting (last visited Dec. 23, 2024).

[39] https://knowledge.sovrn.com/kb/how-to-setup-sovrn-ad-tags-for-header-bidding

57.     Specifically, Sovrn, via the Lijit pixel, collects information used to identify individuals across the Internet including, but not limited to, cookies, IP addresses, email addresses, HTTP headers that specify information such as type of browser, device and operating system information, location information, and other unique identifiers associated with web addresses.[40]  In addition, Sovrn collects information regarding the users' activity on the websites and communications with the websites in the form of full-string URLs.  Finally, Sovrn is able to pair this information to any it has otherwise collected about the user and has compiled into a profile of the user that Sovrn maintains, as alleged below.

58.     All of the above information is used to identify individuals and track their activity, but persistent identifiers and URL information play particular roles in the Sovrn surveillance apparatus.

### 1.     Persistent Identifiers

59.     One way Sovrn tracks individuals across multiple websites is through the use of persistent identifiers.  As the name suggests, persistent identifiers are identifying information that follows an Internet user from one website or app to another. Sovrn uses these identifiers to confirm that using a particular website is the same person identified by Sovrn on another website.

### (i)     Cookies

60.     One form of persistent identifier is a browser "cookie." "Cookies are bits of data that are sent to and from your browser to identify you.  When you open a website, your browser sends a piece of data to the web server hosting that website."[41]

---

[40]https://www.sovrn.com/privacy-policy/privacy-policy/#Our-Information-Sharing-Practices

[41]    https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2    (last visited Dec. 23, 2024).

61.     When the Lijit pixel is called onto a website, it automatically downloads multiple

cookies onto the browser of the person visiting the website.



62.     **In other words, Sovrn effectively "stamps" each cookie with its own identifier to better enable it to track individuals across the internet.**

63.     Even more invasive, three of the cookie values assigned to an individual and shared widely by Defendant are not random cookie values, but are rather "hashed" versions of the individual's email address.

64.     Email hashing is a way to encrypt emails by transforming them via algorithm to a unique string of numbers. There are several common methods of hashing that are employed by Sovrn.

65.     While hashing prevents a hacker or other unintended recipient from decoding the email address, if the recipient of Defendant's ID syncing exchange (described below) already has the

email address, that entity will be able to match the hashed email address to the same email address in its records and, thus, deanonymize each individual website visitor.

66.    The purpose of using an individual's email address as the shared identifier is straightforward: an email address can be matched with the existing records of the partner company and/or easily deanonymized (see below) which makes it almost impossible that the company receiving the information will not be able to identify the individual. As such, Defendant, by widely sharing the cookie values with Partner Pixels, allows for an unknown number of advertisers and data brokers to receive information about an individual's web and app activities and simultaneously receive information identifying that specific individual.

67.    After the cookie is loaded onto a person's browser, each time that person visits a website where the Lijit pixel is called, Sovrn uses the cookies placed on the individual's browser to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser.  As such, Sovrn is able to track each individual internet user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits. [42]

68.    This information is cross-referenced with other information collected by Sovrn to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual in order to sell their profile for targeted advertising.

### (ii)    IP Addresses

69.    IP addresses are another common persistent identifier.

70.    An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[43]

---

[42] https://knowledge.sovrn.com/kb/sovrn-ortb-cookie-sync-spec

[43] *See, e.g.*, https://www.cloudflare.com/learning/network-layer/internet-protocol/ (last visited Dec. 23, 2024); https://netbeez.net/blog/rfc1918/ (last visited Dec. 23, 2024).

71.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

72.     IP addresses are not freely accessible. If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

73.     IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[44] Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[45]

74.     An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[46] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[47] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[48] because "[c]ompanies can use an IP address … to personally identify individuals."[49]

75.     In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving

---

[44] https://iplocation.io/ (last visited Dec. 23, 2024).

[45] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[46] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[47] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/4uk2p7k9.

[48] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[49] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[50]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[51]

76.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[52]

77.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[53]

78.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[54]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[55]

79.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[56]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[57]

80.    Putting IP addresses in the hands of a data broker like Defendant is particularly invasive, as the NATO report noted:

---

[50] *See, e.g., The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[51] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[52] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

[53] *Id.*

[54] Williams, *supra*, https://tinyurl.com/4uk2p7k9.

[55] *Id.*

[56] *Id.*

[57] *Id.*

---

[a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[58]

81.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[59]

(iii)    **Mobile Advertising Identifiers**

82.    Sovrn employs similar methods to track individuals using mobile apps on Android and iOS devices.

83.    Sovrn owns and operates multiple "software development kits" (SDKs), pieces of code that work independently or with "application programming interfaces" (APIs) and are loaded into mobile apps and can track users' activity on certain apps.[60]

84.    An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[61]

85.    An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers

---

[58] TWETMAN & BERGMANIS-KORATS, *supra* at 11.

[59] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

[60] https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface) (last visited Dec. 23, 2024).  Plaintiffs will refer to both collectively as the "Sovrn SDKs" to avoid any confusion.

[61] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[and] business partners."[62]  An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[63]  APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[64]

86.    Similar to the pixels on web browsers, the Sovrn SDKs are called by other SDKs when a user accesses a particular app.

87.    The Sovrn SDKs track the types of user information Defendant obtains through the Lijit pixels including, but not limited to, users': location information, email addresses, device and advertising identifiers, and usage of the particular app being accessed.

88.    In addition to its own ID tracking, Sovrn collects advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").

89.    An AAID is a unique string of numbers which attaches to a device.  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[65]  So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

90.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier.  The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).  Byron Tau, MEANS OF CONTROL: HOW THE HIDDEN ALLIANCE OF TECH AND GOVERNMENT IS CREATING A NEW AMERICAN SURVEILLANCE STATE at 175

---

[62] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[63] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[64] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[65] https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Dec. 23, 2024).

(2024) ("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices. Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

91.    Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[66] Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[67]

92.    Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

93.    Similarly, an "Identifier for Advertisers", or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads, and keep track of their post-install activity."[68]

94.    As with the Sovrn Cookie Sync Pixel and AAID, Sovrn's collection of IDFAs allows Sovrn to track iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, sufficiently permits even an ordinary person to identify a specific individual with the IDFA.

95.    Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is

---

[66]https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5 (last visited Dec. 23, 2024).

[67] https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Dec. 23, 2024).

[68]https://www.appsflyer.com/glossary/idfa/#:~:text=Identifier%20for%20Advertisers%2C%20or%20IDFA,of%20their%20post%2Dinstall%20activity (last visited Dec. 23, 2024).

the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[69] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as e-mail addresses, geolocation, or phone numbers.



96.      ID Bridging "has long been the foundation of programmatic advertising,"[70] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[71] It entails a "unique identifier[] assigned to individual devices," including "Google's Advertising ID," personal information like geolocation and e-amil address, and "cross-platform linkage."[72]

97.      ID Bridging is a money-making machine for advertisers and app developers.  On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'"  And on the app developer side,

---

[69] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

[70]  https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[71] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

[72] Anete Jodzevica, I*D Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/.  Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

"publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[73]

98.    In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information.  And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

99.    Many companies (*e.g.*, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging

100.    Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but.  As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them."  *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

101.    In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and Oracle's, ironically) as Defendant's:

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid.  It is largely collected invisibly and without consumer consent. Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more.  It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[74]

---

[73] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

[74] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

102.    In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like Defendant without the knowledge or consent of users, all of which is being done for pecuniary gain.

**(iv)    Other Identifiers**

103.    In addition to the methods described above, which are explicitly designed to track individuals across different devices and apps, Sovrn collects other identifying information that allows it to determine whether the same individual is visiting multiple websites or using multiple apps where Sovrn technology is called to or installed directly.

104.    One method is through collecting e-mail addresses. The logic of this is straightforward. If Sovrn collects the same e-mail address from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person. The same is true of devices. If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

105.    Location information functions in a similar manner.  If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

106.    HTTP requests, when intercepted by Sovrn, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person.  With every visit, and every subsequent HTTP request, the device information will be identical in each.

### 2.    *Universal Resource Locator*

107.    In addition to collecting a myriad of identifiers, the Lijit pixel collects the Universal Resource Locator (URL) of the webpages visited by each individual.

108.    Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

109.    Each page on a website has its own individual URL, allowing pixels with access to the URL to see which pages of a website a particular internet user visited.

110.    All URLs identify the pages of each page of a website an internet user visited, but some—depending on the design of the website—also disclose the contents of information entered onto a webpage. These URLs are known as full-string descriptive URLs.

111.    For example, when applying for a loan on the Zillow website, each property selected by a user is contained in the URL for the property page. When the URL data is transferred to a third party, like Defendant, that communication is transferred with it.



112.    This process works similarly on other websites.

113.    The Lijit pixel collects both types of URLs and any information that can be gleaned or inferred from those URLs are added to the profiles that Defendant has for that particular user.

*3.    Identity Resolution*

114.    In addition to its own tracking of individuals across the internet, Sovrn sells its tracking services to other advertisers who own and operate pixels through a process known as identity resolution.

115.    Identity resolution is the technology marketing term for the process of data tracking described above. As Sovrn describes their process:

> We may collect Non-Personal Information through Sovrn Services or we may create Non-Personal Information from Personal Information by removing identifying information (such as email address or device identifiers). We may use Non-Personal Information for a variety of purposes to operate and improve the Sovrn Services, such as functional testing, analyzing usage patterns, market research, data analysis (including in support of Interest-Based Advertising), and developing new products.
>
> We may also use Non-Personal Information on Readers' activities collected from Publisher websites (such as page views, use of ad blocking technology, and search queries) to provide aggregate

information to Publishers so that they can improve their content and optimize advertising revenue.[75]

116.    In plain language, identity resolution is the culmination of Sovrn's tracking, where it assigns a Sovrn ID (the hashed version of the individual's email address) to an individual so that the individual is attached to a record of their web and app activity for the purpose of targeted advertising.

117.    Once sufficient data has been collected on an individual, Defendant monetize the individual's data in a number of ways.  One way is to provide individuals' identities and web browsing information to the companies operating the Partner Pixels to assist with those companies' collection of internet users' data.

118.    When a Partner Pixel is loaded onto a website and calls a Lijit pixel onto the website, the Lijit pixel (in addition to the independent tracking described above) interacts with the pixel that called Sovrn onto the site.  Specifically, Sovrn provides the Sovrn ID to each of the pixels it interacts with and allows those pixels to access the information associated with each individual.

119.    With respect to the delivery of targeted advertisements on websites, Sovrn's ID syncing facilitates the real-time-bidding process by identifying the individual visiting the site and providing information about their web activity and interests.  This creates the basis for hyper-targeted advertising related to that activity and those interests to be served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via the Lijit pixel.

120.    For these processes to happen, Sovrn must necessarily share the information it collects on individual internet users with its partners.  The identity resolution service thus aids in the wiretapping and surveillance conducted by the Pixel Partners.

121.    As part of their investigation, Plaintiffs' counsel conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by Sovrn.  For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.  *See* Factual Allegations § III, *infra*.

---

[75]https://www.sovrn.com/privacy-policy/privacy-policy/#How-We-Collect-Information

122.     Specifically, Plaintiffs' counsel found that each website and/or app had Partner Pixels loaded onto it, which in turn called Sovrn to better enable their advertising.  Each Partner Pixel would itself intercept users' communications with the website or app.   Each Partner Pixel—which contracted with Defendant—would then call a Lijit pixel to aid or enable this interception.  The Lijit pixel would then assign a Sovrn ID to the user's activity on the website or app, which, among other things, (i) allowed for the user to be identified; (ii) link the user to information from across other websites and apps; and (iii) benefit the websites, apps, and Partner Pixels by making that user more valuable to advertisers because the user could be better targeted with relevant ads due to the extensive information Sovrn collected and provided to the Partner Pixels.

123.     In addition to using the data collected on an individual for identity resolution, Defendant adds the information to its own consumer data profiles, which are used to create its data products.

**B.     Sovrn's Ad Exchange (SSP)**

124.     The products Sovrn develops are all part of Sovrn's Ad Exchange, which acts as a supply side platform (SSP) in the real-time bidding process.

125.     The Ad Exchange "allows publishers to automate the sale of their ad inventory. SSPs give content creators the ability to set up ad tags based on their website layout. Once those ad tags are created, they place the ad tags on their site." [76]

126.     Sovrn boasts about its relationship with all the top SSPs (Google Ad Manager, Amazon TAM, PubMatic, Magnite, and targeted partners such as PulsePoint and Beachfront.) [77] Because of Sovrn's relationship with all the top SSPs, Sovrn can "negotiate better 'take rates' with these exchanges than the typical publisher could get on their own — allowing [its customers] to earn more revenue from the start." [78]

---

[76] https://www.sovrn.com/blog/all-about-ad-servers/

[77] *Id.*

[78] *Id.*

127.    Sovrn utilizes a "unified page-level auction, as opposed to Prebid, which runs individual auctions for each ad property on the page." This in turn "improve[s] yield by utilizing bid responses more efficiently, thus requiring fewer bid requests."[79]

128.    Sovrn also offers Server to Server Bidding (S2S Solutions). S2S Solutions is an "API endpoint (lijit.com/bidder) that allows publishers to make bid requests from their server instead of from the browser. S2S (server to server) is an alternative to traditional C2S (client to server)."[80]

129.    Through these services, Sovrn sells the personal information it collects on individual internet users.

130.    For individuals who visit these the sites publishing ads via Sovrn's Ad Exchange, Sovrn admits that, "we set cookies (where allowed) at the first visit to any of the Publisher sites that deploy Sovrn Services. If our cookie is already set on a browser, we recognize a returning Reader and log data using the existing cookie."[81]

131.    With the information gathered with the cookies, Sovrn, on its own privacy policy under a heading titled "How We Use Information," provides insight into how it creates user profiles for users, or "audience segments," as Sovrn refers to them as: "by categorizing Personal Information we have collected by common interests, intent or other characteristics. … Audience segments are used to provide additional insights, enrichment of our Publisher's first party data, and to attribute reader interests to browsers and devices to better inform advertising campaigns.[82]

## III.    THE LIJIT PIXEL IS PRESENT ON EACH OF THE SUBJECT WEBSITES

132.    As demonstrated below, Defendant's Lijit Pixel is present on each of the websites visited by Plaintiffs, collects information on Plaintiffs' and Class Members' interactions with those websites, and assists the Pixel Partners in the wiretapping and surveillance of Plaintiffs and Class Members on the subject websites.

---

[79] Id.

[80] https://knowledge.sovrn.com/kb/sovrn-server-to-server-bidding-openrtb-integration

[81] Id.

[82] Id.

**A.     Buzzfeed**

133.    Buzzfeed is a popular entertainment and culture website, featuring articles and quizzes related to popular culture.

134.    Unbeknownst to website visitors, the Lijit Pixel is loaded onto the Buzzfeed website.

135.    As soon as an individual reached the Buzzfeed website, the Lijit Pixel loads tracking cookies on their browser in the manner described above.

```
Cookie: ljt_reader=JxXvATZH21ThK25OTo6V7DYR;
_ljtrtb_8050=ZGEAAWdPYUAAAAAICg5cAw==;
_ljtrtb_103=0PU2bb330cb4ac0459790a0237a4cd413b58; _ljtrtb_106=7222484977769148318;
_ljtrtb_83=M477FU9H-X-BFUR; _ljtrtb_80=M477FU9H-X-BFUR;
_ljtrtb_71=B93E9975-842E-49FC-BC7A-6977CAF10B75;
_ljtrtb_58=B93E9975-842E-49FC-BC7A-6977CAF10B75;
_ljtrtb_43=F_UCshfxB-IMpwXzQvEb4RD7UOMMpwGwR6DOSpcG;
_ljtrtb_27=d02a11b1-20c8-4592-93b5-a32be2af8121;
_ljtrtb_84=Z09jOySzKX95ORCRRVn4LWj3; _ljtrtb_92=476255108948676925;
_ljtrtb_16=99e2fa08-188a-4faa-af97-dfb869124302-674f6315-5553;
_ljtrtb_2=C4CD0F7806E64DC7855B70C7DCC30341; _ljtrtb_49=6OeZRc7PocHd;
_ljtrtb_86=iSY1YZleTFnePiXyZk6Ict0XPGnc0KLbHe9VuW-4kyU;
_ljtrtb_26=ede73443-05b9-458a-97a2-f1dc6b0634ea;
_ljtrtb_102=2cb96f14-34f4-5c6c-bc24-254be3dfdb50;
_ljtrtb_97=RX-99d0f860-139a-416e-bf35-b125b618e011-005; _ljtrtb_8101=mmHAYQmGZI;
_ljtrtb_108=164b28a6ac; _ljtrtb_85=AADUWE70jmsAABYKGgl1aw;
_ljtrtb_76=a37aa3df-58da-0cb2-36e7-8eea26974eb3; _ljtrtb_273657=273657;
_ljtrtb_279534=ua-45885d30-7ea6-331e-9047-6474b7b0cb53;
_ljtrtb_42=f43d4904-7f0f-4490-8b1f-5dd372a227d0-tucte48e884;
_ljtrtb_66=1137796003968; _ljtrtb_1=29714540330093203275;
_ljtrtb_5110=6817168251008075773; _ljtrtb_5=1610tbc2ngoh;
_ljtrtb_5011=205960905144004269747;
ljtrtb=eJyNU01vGzkM42FS8%2BLwFSokRpgR7G448EaWDXqRvbl0LSaNKmzQeQZLPZxf73paY99tA5zfA
9kXxPb4%2F6deT42F7e0ZkRaJHtNGH2R8z04p1qGKZLaDLEdiFBFGSgZGG4jN6yzU1rih3QJOIMoHBEpQbD
USbHSRrcjVpDGRIuRyV6zf1tCuyfShng9YCOtTqab3auuthe8SuPef9jSvd67t3yohGcRZvnCM0kYMGH41
TREiRebTLGMVBYLMEjqse5r104KNI360I59K4se25O0CMA47BI5CNCZh8hTxaB5mMy55CQSJAnNo3G5KV1
OwwggtDAizZgPVVINSajM7gmm2TQdiWubs7644f7tanc605baU1g069jei1OZGnQ9JqoqbcBxLywag4DCh
OpFVz4felUdszxmrGhAEo683xmBKkMQoMYw4%2BkmGLBrsw6cO5eM61KdN6UYgdo7WI0aE1U8%2Fmec4%2F
9AlcS0C89L3oJsO0Fe1n0vUXL7UYJG9GUHP1IDJZHB1d8gVwMg3Gcq3o3ZL3jRzZK3mz3JmedVjKnghoWi
ZjQqM9cmDQ2LYKmxdITPudSzP3Nw5cpatFZVuAl1tTwGN1gEqcmDtVQhIgt4Fs6StfkPgdi8EWMMB1bXNDn
EwVKYkqfQJYus9vEMDjBf7XfTkTDN5mxC8qk0pw0104j1rsxq54sS23Ynj1frt6t42PLg7RbXb9bvfpnt9
f304pabK6brG4%2FXsrm9u6p6%2BbH18PNd0qvDW27fz060vHOvz5c3dft18Fb6Zs42FL8942K7vS7b4n89
q4%2FPRyCfztbd4%2F2BqGb42FyHZgVQ8y4gisrxAyaWMGwYpJxsiA8PxSniuHGnRPdcUrT7v%2B6cv499
zOL98fD08ffhrmXm3kP3mUr4%2FXrzu%2F2Pw91vXsv%2F8BNiIAaA%3D%3D;
```

136.    Defendant also collects device information and browser fingerprinting information, as described above.

```
sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML,
like Gecko) Chrome/132.0.0.0 Safari/537.36
```

137.    There are multiple companies servicing real-time bidding for advertising space on the Buzzfeed website. As described above, the servicing of these advertisements requires the instant sharing of a large amount of information.

138.    Defendant profits from this advertising ecosystem by ID syncing and cookie matching with at least 15 Partner Pixels, including providing the Partner Pixels with the individual's email address.

```
location: https://ap.lijit.com/dsp/google/cookiematch/dv
```

139.    Defendant also participates directly in the real-time bidding process. In the image below, Defendant is providing the A-MO Partner Pixel with identity resolution for the purpose of bidding on advertising space targeting the particular website visitor (Sovrn is listed as the "bidder").

```
https://ap.lijit.com/pixel?gdpr=0&gdpr_consent=&us_privacy=&gpp=&gpp_sid=&redir=ht
tps%253A%252F%252Fsync.a-mo.net%252Fsetuid%253FA%253D19802842-2f76-44cb-8aae-d0a7e
24c6fcf%2526bidder%253Dsovrn%2526uid%253D%2524UID   200
```

140.    Defendant adds the information it receives information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to the individual—and enriches Buzzfeed —as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

141.    Defendant, because of the setting of cookies and collecting of the user's device information and email address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**B.    Bon Appetit**

142.    Bon Appetit is a website featuring a wide variety of recipes and related articles about restaurants and food.

143.    Unbeknownst to website visitors, the Lijit Pixel is loaded onto the Bon Appetit website.

144.    As soon as the user reaches the Bon Appetit website, the Lijit Pixel loads tracking cookies onto the individual's browser in the manner described above.

```
set-cookie: _ljtrtb_103=OPU0c74cdb1ec84c0a9de1e68526b7af2b; Expires=Thu, 01 Jan
1970 00:00:00 GMT; Max-Age=0;Secure;SameSite=None
set-cookie:
ljtrtb=eJyNU0tzEzkQ%2Fi8%2Bo6puqR9qbmMHZ4GkErYSks2FGr1YgmsTEtsxbO1%2FRzJXDnuZmpn%2
B1P09Wv8uRBavF4gkpIghEsri1SIi%2Bv6byYKwKnhCI1TTXmMAHlUCjKFQxGKYEmYibtK41RaME3WkH60
VLQnH7CBHc2S1OENfXPW9d1XPsfmB1Y5NAWrFV1zzc3CUcnIzMDnxibVIbXMMHUvWsY%2Fz0%2FYTXfw4f
2B44D3uesF%2BkSYMwUiDBGbzGqGXdHBe%2BxoMLGvnI06OiMBFOfurUu%2Fwk1M3wz1Nrj8eesqWPZUm
gstFUcAc4eDuKwVBAGBrcsCHu2HVK%2FZVFAcaVFHotUlwOS4CJmZzjYPKowIgyeaYgxg3DuLeBp9OP5%2
Fmjhm5jY3Cr6PyxEczRmdxegdBW3MWGco7ERVa1ZzzDwMHF4QRMMOFS8aIFCUEe4wcCVhxUuUONG6e01TE
O1hebX1ypbL42gYQOIsgBwdZ4%2BOYW6%2F%2FOHQ46ratMFxWn%2B%2BXlxcXjfISrkkrD1ShtlKxSqRv
SSdm09D%2F1jGWu83h5f0MMvfj8fzQ2iUCEEDoyL3SMlgrE0cTp7TyRLixz8c3rpTubk%2BnhlGKsVAwqW
2AQ2%2Fh3odO36M7%2FjSkdS%2F7kJ73tyevfvgdmf3P%2FZf35ztVx9T3y76YDlN58%2BnoBffD3maltc
3u%2Fj%2Bff0wqoPtju7Xm5sX31x9%2B4sO%2FJXl8%2FOLOz252789xG%2Fk6svbw3L%2F2R4f8GUs9HA
zccgcOLvioV%2BUVszF1MMLzUNoPb5kyW13eVu59Ztax7khSfb7FFOIX9r14WmrB27%2FTLYLdH95dfi2v
YJd%2B3736cnb4r%2BfjPH1kA%3D%3D; Path=/; Domain=.lijit.com; Expires=Sat, 7 Feb
2026 20:16:36 GMT; Max-Age=31536000;Secure;SameSite=None
set-cookie: _ljtrtb_80=M4DB08VH-1X-G6WU; Path=/; Domain=.lijit.com; Expires=Sat, 7
Feb 2026 20:16:36 GMT; Max-Age=31536000;Secure;SameSite=None
set-cookie: ljt_reader=J3TUAQZHbnKtwaDqSsyz8S5p; Path=/; Domain=.lijit.com;
Expires=Sat, 7 Feb 2026 20:16:36 GMT; Max-Age=31536000;Secure;SameSite=None
set-cookie:
ljtrtbexp=eJxdkEsWQjEIQ%2FfS8RsQoHzcmse9a209TxjepIHQ5zAbD7gEwhzzGvxDDddrOBrv5z6DaH
Fm%2BlagRPCvEjvDJryUoDoDVjmksZ6JzMiVn8236rPc%2ByZ%2F%2BPiUFms%2Fe%2BvcbjwX3P2IuyB1
```

145.    The Lijit Pixel is part of a large web of identity resolution and cookie syncing facilitating real-time bidding for targeted advertisements on the Bon Appetit website.

146.    The Lijit pixel shares the user's email address with a number of Partner Pixels. The image below shows one such transmission. The "merge" request indicates a hashed version of the user's email address is being shared with the Partner Pixel.

```
https://he.lijit.com/merge?pid=8105&event_type=email&lc_md5=ba05d0c712f0d4af319982
8470e1bd9b&lc_sha1=d04873aa31a9d555877049021df6b96cf9a7a20e&lc_sha256=2a9a22d88b03
1064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb&=
```

147.    The Lijit Pixel is also sharing information to assist Partner Pixels target advertising in real time. For example, in the below image, the Lijit Pixel is cookie syncing, providing identity resolution, and sharing information with the Id-5 Partner Pixel. Milliseconds after receiving that information, the id-5 Pixel syncs with the OpenRTB Pixel and the ShareThis Pixel. The Id-5 Pixel then uses all of this information to place a bid using the Taboola (another Partner Pixel) real-time bidding network. All of this information sharing happens in less than one minute.

```
https://ap.lijit.com/pixel?
Fri Feb 07 15:16:57 EST 2025

redir   https://id5-sync.com/c/464/181/2/6.gif?puid=$UID&gdpr=0&gdpr_consent=
sovrn_retry   true
gdpr   0
gdpr_consent


https://id5-sync.com/c/464/181/2/6.gif?
Fri Feb 07 15:16:57 EST 2025

puid   J3TUAQZHbnKtwaDqSsyz8S5p
gdpr   0
gdpr_consent


https://openrtb-us-east-1.axonix.com/syn?
Fri Feb 07 15:16:57 EST 2025

supply  6b5e0640-0286-4e78-b490-a820e3a18a08
gdpr   0
gdpr_consent
uid    na
redirect     https://id5-sync.com/c/464/1201/1/7.gif?puid=xxEMODO_IDxx&gdpr=0&gdpr_consent=


https://id5-sync.com/c/464/1201/1/7.gif?
Fri Feb 07 15:16:57 EST 2025

puid   709dbea5-2580-48e3-8045-b60aded90f66
gdpr   0
gdpr_consent


https://sync.sharethis.com/id5?
Fri Feb 07 15:16:58 EST 2025

uid    ID5-3bb0AI3in7k9s7NqLZMhzHXYkmqxhiQY7uQokp-Ubw
gdpr   0
gdpr_consent
rurl   https://id5-sync.com/a/464/121/0/8/gif/0/0/0/0/


https://id5-sync.com/a/464/121/0/8/gif/0/0/0/0/ZGAADWemajoAAAAIBUdfAw==
Fri Feb 07 15:16:58 EST 2025


https://sync.taboola.com/sg/id5-network/1/rtb-h/?taboola_hm=ID5-3bb0AI3in7k9s7NqLZMhzHXYkm
qxhiQY7uQokp-Ubw
Fri Feb 07 15:16:58 EST 2025
```

148.   Defendant also collects device information and browser fingerprinting information, as described above.

149.   Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to mental health treatment to the individual—and enriches Bon Appetit—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

150.    Defendant, because of the setting of cookies and collecting of the user's device information and email address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**C.    MindBloom**

151.    Mindbloom is a medical website offering prescription plans of ketamine therapy for purchase as a treatment for certain mental health conditions, including depression and anxiety.

152.    Patients seeking these treatments answer intake questions on the website and can make their purchase if they are approved for a prescription.

153.    Unbeknownst to Mindbloom patients, the NYTrng Partner Pixel is loaded onto the Mindbloom website.



154.    As shown in the image above, the NYTrng Pixel collects the URL of the Mindbloom website. This URL is passed to each and every pixel that syncs with either the NYTrng Pixel or any Pixel that as already synced with the NYTrng Pixel.  Because Mindbloom only provides ketamine therapy and related services, this information is  sufficient to conclude that the individual is seeking ketamine therapy (*i.e.*, information about the individual's confidential medical treatment) and that

1   the individual suffers from a narrow range of mental health conditions for which ketamine therapy

2   is a treatment (confidential information about an individual's medical condition).

3       155.    The NYTrng Pixel initiates a web of cookie syncing and identity resolution by calling

4   over a dozen Partner Pixels onto the Mindbloom website.

5       156.    One of those Partner Pixels is the Mediawallah Pixel. The NYTrng Pixel and

6   Mediawallah Pixel cookie sync and provide identity resolution regarding the individual website user

7   to each other after the Mediawallah pixel is called onto the Mindbloom website.

```
Request:
:method: GET
:authority: partner.mediawallahscript.com
:scheme: https
:path:
/?account_id=1009&partner_id=c182f930&uid=06ec38316d4ec21a3bfbfd14&custom=&tag_for
mat=img&tag_action=sync
sec-ch-ua-platform: "Windows"
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML,
like Gecko) Chrome/131.0.0.0 Safari/537.36
sec-ch-ua: "Google Chrome";v="131", "Chromium";v="131", "Not_A Brand";v="24"
sec-ch-ua-mobile: ?0
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: image
referer: https://nytrng.com/
```

19      157.    Milliseconds after receiving the information collected by the NYTrng Pixel, the

20  Mediawallah Pixel cookie syncs and trades identity resolution with Defendant by calling the Lijit

21  Pixel onto the Mindbloom website.

```
:method: GET
:authority: ap.lijit.com
:scheme: https
:path:
/pixel?redir=https%3A%2F%2Fpartner.mediawallahscript.com%2F%3Faccount_id%3D1009%26
partner_id%3Dc182f930%26uid%3D%24UID%26custom%3D%26tag_format%3Dimg%26tag_action%3
Dsync
```

158.    Plaintiff's testing shows evidence that this is a chain of ID syncing, where each ID sync is shared with the next pixel. For example, the Lijit Pixel, which only syncs directly with the Mediawallah Pixel, shows the NYTrng Pixel as the referrer for the syncing request.

```
:method: GET
:authority: ap.lijit.com
:scheme: https
:path:
/pixel?redir=https%3A%2F%2Fpartner.mediawallahscript.com%2F%3Faccount_id%3D1009%26
partner_id%3Dc182f930%26uid%3D%24UID%26custom%3D%26tag_format%3Dimg%26tag_action%3
Dsync
sec-ch-ua-platform: "Windows"
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML,
like Gecko) Chrome/131.0.0.0 Safari/537.36
sec-ch-ua: "Google Chrome";v="131", "Chromium";v="131", "Not_A Brand";v="24"
sec-ch-ua-mobile: ?0
accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
sec-fetch-site: cross-site
sec-fetch-mode: no-cors
sec-fetch-dest: image
referer: https://nytrng.com/
```

159.    As shown above, the Lijit Pixel also collects device and browser fingerprinting information as described herein.

160.    As soon as the Lijit Pixel is called to the Mindbloom website, it loads multiple tracking cookies onto the individual's browser in the manner described above.

```
cookie: ljt_reader=06ec38316d4ec21a3bfbfd14
cookie: _ljtrtb_80=M2UV86KC-V-3I5N
cookie: _ljtrtb_106=8677708197873682693
cookie: _ljtrtb_27=44b567a1-de9e-4d06-b0c3-1293313ca33a
cookie: _ljtrtb_92=2810078903083058127
cookie:
ljtrtbexp=eJxdTzESwDAI%2BkvmDkJijP1ar39vEydlAwT0aWw3rEM5hHY1SBBnnJvolZjZMsqChU7j0o
3d3YIhBCoCyJalBc%2BMWSp0RSDm9KNHgfgfv0%2Fy9NX7AUEiLRc%3D
cookie: _ljtrtb_76=bd0245c0-ed83-0d51-03e3-8cb2baf64f7b
cookie: _ljtrtb_86=Wvqos5FmQGb1ScrdCXiNJxElElhMgU9Ywqt$61KB6aEw
cookie: _ljtrtb_103=OPU7096ba084efe41b09b05798eead56dc8
cookie: _ljtrtb_43=POsY1Tm4GYYn5RnSP7kHgju_T9YnuU_TbriFTQur
cookie: _ljtrtb_58=36630DE6-FF91-4AC0-B72B-3B82062012E7
cookie: _ljtrtb_85=AAEb6U7OQnoAABTJydcbLw
cookie:
ljtrtb=eJwdj8tSwzAMRf8lazwjW7Yss0tKwqP0RZNCVkwcp1Cg7bSllMfw7zhs7znS1X4Sw8l5gkQIFzm
JonBS6HQAIrMgE5ixAlIgVW6Tg0QCRnkyrSw48g2w7padlh6cB2Mdd10TDIWWo6tsVLX2hmwjRehcJ3QAE
h5aFFI5RI1tg9j876UoMllrgsWzbJFYkcPIGCIagWrBNByIhcBrHsfYqRgr1gCWHSAwgmGp%2BivZRJSmu
afKTmabb2pm5c1XaP3tqad91f3HbnswxXp26eW8%2FQ6Dh9X45jN%2Fy59HT5WrT7v3Oc1hRk3ej%2Bj%2
B6%2BnkUMtyr$%2FremPuNVOpfb16ej%2B1q7eHKvH0u9XRTk7%7qNv%2BwofQGnTgugCo4BgpADsUHDrl
W%2BWpjFWJ7T9%2F0BZi7Q%3D%3D
cookie: _ljtrtb_2=F93FB0542BA2403992BAE7E7EDDBDA82
```

161.    Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described

herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to mental health treatment to the individual—and enriches Bon Appetit—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

162.    Defendant, because of the setting of cookies and collecting of the user's device information and email address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**D.    Zillow**

163.    Zillow's website, zillow.com, is an online resource for real estate renters and buyers nationwide. Website visitors can view listings for specific properties, search for properties in specific geographic areas, and apply to rent or buy specific properties.

164.    Unbeknownst to website visitors, dozens of Partner Pixels are loaded onto the Zillow website.

165.    Of particular importance here, the PubMatic and Google Syndication Partner Pixels are loaded onto the Zillow website.

> :authority  ads.pubmatic.com

> https://6e14c3721f1b9c0fe66b7a8156e3b749.safeframe.googlesyndication.com/

166.    Each of these Partner Pixels independently calls the Lijit Pixel onto the Zillow website.

167.    The Lijit Pixel, in addition to cookie syncing and providing identity resolution to these Partner Pixels, provides 3 different hashed versions of the individual's email address to each Partner Pixel via a "merge" request. The image above demonstrates this: MD5, SHA1, and SHA 256 are each common forms of hashing.

> https://he.lijit.com/merge?pid=81004&event_type=email&lc md5=75eb19c7e35████████2
> 632c940202&lc sha1=4a6864██████████6279dd33c51a00657f454121&lc sha256=4441168bbb01
> 1a7█████████304a48a9696fcfd838181a1c61ce2c58a416d&=

168.    Further, each Partner Pixel intercepts the detailed, full-string URL of each page of the Zillow website a user visits, thus intercepting their communications with the Zillow website regarding searches and selections of particular properties.

```
"page":
"https://www.zillow.com/homedetails/10615-Gothic-Ave-Granada-Hills-CA-91344/20146387_zpid/",
```

169.    The Lijit Pixel also receives these communications during the cookie syncing and aids in the interception of those communications by helping the Partner Pixels identify which individual is communicating with the Zillow website.

170.    As soon as the Lijit Pixel is called onto the Zillow website, it loads several tracking cookies onto the individual's browser in the manner described above.

cookie: ijt_reader=JsXvA1ZHZ1ThK2S01o6V7DYf6;_ijtrtb_8050=ZGtAAWdPYtYAAAAAiLg5cAw=~;_ijtrtb_42=1D5-de20dNc0QV1gtLR3Fi58uJ3V20xGWP5ToXoErBWFOSg;_ijtrtb_103=OPUZbb330cb4ac0459790a0237a64;_ijtrtb_106=72224849777691448318;_ijtrtb_83=M477FU9H-X-8FUR;_ijtrtb_80=M477FU9H-X-8FUR;_ijtrtb_71=89JE9975-842E-49FC-BC7A-6977CAF10875;_ijtrtb_58=89JE9975-842E-49FC-BC7A-6977CAF10875;_ijtrtb_43=FJJCshfx8-lMpwXsCvEb4RDJUOMMpwGwR6OOSpc6c_ijtrtb_27=d02a11b1-20e8-4592-93b5-a32be2af8121;_ijtrtb_84=Z09jGySzJX09SORCRRWn4LWJ3;_ijtrtb_92=476255108948676925;_ijtrtb_16=99e2fa08-188a-4faa-af97-dfb86912430Z-674f6315-5553;_ijtrtb_2=C4CD0F7806E64DC7855B70C7DCC30341;_ijtrtb_49=6OeZRc7PocHd;_ijtrtb_86=iSY1YZleTTnePtXyZK6lct0XPGrx.8K0.bHe9VuM-4kyU;_ijtrtb_26=ede73443-05b9-458a-97a2-f1dc6b0634ea;_ijtrtb_102=2cb96f14-34f4-5c6c-bc24-254be3dfdb50;_ijtrtb_97=RX-99d0f860-139a-416e-bf35-b125b618c011-005;_ijtrtb_8101=mmHAYQmGZt;_ijtrtb_108=164;_ijtrtb_85=AADUWE7OjmsAABYKXql1aw;_ijtrtb_76=a37aa3df-58da-0cb2-36e7-8eea26974eb3;_ijtrtb_273657=273657;_zpids=8100f75eb19c7e350b8894d8b92632c9d0202_4a686435f0772SebD527f9d433c51a0065ff454121_44411168bbb011a7aebcdb3f42de304a48a9696fcfd838381a1c61ce2c58a416d,"

171.    The Lijit Pixel also collects device and browser fingerprinting information as described herein.

172.    With respect to the PubMatic Pixel, Defendant, through the Lijit Pixel, is providing information to PubMatic so that PubMatic can bid on a banner ad on the Zillow website in real time. After receiving the merge request and identity resolution from Defendant, PubMatic placed a bid for the ad space.

```
https://hbopenbid.pubmatic.com/translator?source=prebid-client
POST  hbopenbid.pubmatic.com   /translator?source=prebid-client
```

```
"data": {
        "aupname": "/7449/Zillow/Property_Details/Buy_Agent/b_right_p3",
        "adserver": {
                "name": "gam",
                "adslot": "/7449/zillow/property_details/buy_agent/b_right_p3"
        },
        "pbadslot": "/7449/zillow/property_details/buy_agent/b_right_p3"
}
```

```
"bidfloorcur": "USD",
"displaymanager": "Prebid.js",
"displaymanagerver": "9.25.0",
"banner": {
        "w": 300,
        "h": 250,
        "pos": 0,
        "topframe": 1
```

```
"ext": {
        "wrapper": {
                "wiid": "136e092c-c2cb-418f-99b8-9fa328c7063f",
                "wv": "prebid_prebid_9.25.0",
                "transactionId": "e17f391e-185f-4020-853d-90841daf58d4",
                "wp": "pbjs"
```

173.     With respect to Google Syndication, the information provided by the Lijit Pixel to Google is shared with the dozens of pixels that interact with the Google Syndication Pixel. It is likely that Defendant also receives information provided to Google from these other pixels.

174.     Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to mental health treatment to the individual—and enriches Bon Appetit—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

175.     Defendant, because of the setting of cookies and collecting of the user's device information and email address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

**E.     AliExpress**

176.     AliExpress is a discount shopping website that offers a wide variety of consumer goods for sale at very low prices.

177. Unbeknownst to website visitors, the Mediawallah Partner Pixel is loaded onto the AliExpress website.

```
https://partner.mediawallahscript.com/?account_id=1009&partner_id=c182f930&uid=JxXvA
TZH21ThK250To6V7DYR&custom=&tag_format=img&tag_action=sync
```

178. The Mediawallah Pixel calls the Lijit Pixel onto the website and the Lijit Pixel provides identity resolution and cookie syncing to Mediawallah.

```
:authority: ap.lijit.com
:method: GET
:path:
/pixel?redir=https%3A%2F%2Fpartner.mediawallahscript.com%2F%3Faccount_id%3D1009%26pa
rtner_id%3Dc182f930%26uid%3D%24UID%26custom%3D%26tag_format%3Dimg%26tag_action%3Dsyn
```

179. The Lijit Pixel also collects device and browser fingerprinting information as described herein.

```
sec-ch-ua: "Not A(Brand";v="8", "Chromium";v="132", "Google Chrome";v="132"
sec-ch-ua-mobile: ?0
sec-ch-ua-platform: "Windows"
sec-fetch-dest: image
sec-fetch-mode: no-cors
sec-fetch-site: cross-site
user-agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML,
like Gecko) Chrome/132.0.0.0 Safari/537.36
```

180. The Lijit Pixel also loads multiple tracking cookies onto the individual's browser in the manner described above.

```
cookie: ljt_reader=JxXvATZH21ThK250To6V7DYR; _ljtrtb_8050=ZGEAAWdPY0AAAAAICg5cAw==;
_ljtrtb_103=OPU2bb330cb4ac0459790a0237a4c413b58; _ljtrtb_106=7222484977769148318;
_ljtrtb_83=M477FU9H-X-BFUR; _ljtrtb_80=M477FU9H-X-BFUR;
_ljtrtb_71=B93E9975-842E-49FC-BC7A-6977CAF10B75;
_ljtrtb_58=B93E9975-842E-49FC-BC7A-6977CAF10B75;
_ljtrtb_43=F_UCshFxB-IMpwXsQvEb4RD7UOMMpwGwR6DOSpcG;
_ljtrtb_27=d02a11b1-20c8-4592-93b5-a32be2af8121;
_ljtrtb_84=Z09jGySzKX95ORCRRVn4LWj3; _ljtrtb_92=476255108948676925;
_ljtrtb_16=99e2fa08-188a-4faa-af97-dfb869124302-674f6315-5553;
_ljtrtb_2=C4CD0F7806E64DC7855B70C7DCC30341; _ljtrtb_49=6OeZRc7PocHd;
_ljtrtb_86=iSY1YZleTFnePiXyZk6Ict0XPGnc8KLbHe9VuM-4kyU;
_ljtrtb_26=ede73443-05b9-458a-97a2-f1dc6b0634ea;
_ljtrtb_102=2cb96f14-34f4-5c6c-bc24-254be3dfdb50;
_ljtrtb_97=RX-99d0f860-139a-416e-bf35-b125b618c011-005; _ljtrtb_8101=mmHAYQmGZI;
_ljtrtb_108=164b28a6ac; _ljtrtb_85=AADUWE7OjmsAABYKXgl1aw;
_ljtrtb_76=a37aa3df-58da-0cb2-36e7-8eea26974eb3; _ljtrtb_273657=273657;
_ljtrtb_279534=ua-45885d30-7ea6-331e-9047-6474b7b0cb53;
_ljtrtb_1=712222762253440909;
3pids="8100:ba05d0c712f0d4af3199828470e1bd9b,,d04873aa31a9d555877049021df6b96cf9a7a2
0e,,2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb,,|8105:ba05d0c7
12f0d4af3199828470e1bd9b,,d04873aa31a9d555877049021df6b96cf9a7a20e,,2a9a22d88b031064
ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb,,";
_ljtrtb_42=f43d4904-7f0f-4490-8b1f-5dd372a227d0-tucte48e884;
_ljtrtb_66=1137796003968;
```

181.    Defendant then adds this information to its profile on the individual. This profile is connected to the ID assigned to the individual and added to Defendant's data products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to mental health treatment to the individual—and enriches Bon Appetit—as its users are more valuable now that their information is being connected to Defendant's vast repository of information and user profiles.

182.    Defendant, because of the setting of cookies and collecting of the user's device information and email address, tracks the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the real-time-bidding advertising process.

## IV.    DEFENDANT'S SERVICES DEANONYMIZE USERS AND ENRICH DEFENDANT, WEBSITE OPERATORS, AND PARTNER PIXELS ALIKE THROUGH REAL-TIME-BIDDING AND PROFILING INDIVIDUALS

### A.    Defendant Combines The Data From All The Subject Websites With Other Data To Deanonymize Users

183.    As a result of Sovrn being called to thousands or millions of websites, Defendant is collecting various forms of PII and web activity records of millions of people.

184.    The information collected, on its own, is enough to identify the individual internet user.  But this is only the first step in Defendant's practices of dragnet surveillance.

185.    Defendant also combines the data from each and every website a person visits with other data collected to bolster the profiles of individuals and sells it as part of its products.

186.    Defendant specifically advertises that its can deanonymize the information it collects in order to service advertising based on an individual's interests and activity on websites and apps.

187.    This is further evidenced by the design of the Adverting Exchange products, which by design combine the data collected on the internet with data from other sources, a process only possible if Defendant knows the identity of the person being tracked.

188.    In short, the detailed profiles on nearly every aspect of every American's life require Sovrn to match the identity of each individual with the data collected about them. This makes the profiles much more valuable to Sovrn's customers and increases Sovrn's profits.

**B.**    **The Partner Pixels Use The Profiles Created By Defendants To Enhance Their Advertising And Analytics Services**

189.    In addition to contributing vast amounts of data to individual profiles, the data collected by Sovrn is utilized by the partner pixels to conduct hyper-targeted advertising through the real-time-bidding process. *See* Factual Allegations § I.B, *supra*.

190.    The Sovrn identity resolution process is a key part of a complex ecosystem of pixels which deliver detailed user information to advertisers to increase the efficiency of those advertisements.

191.    When Sovrn shares website visitor information with a Pixel Partner, that partner (i) uses the information provided by Sovrn to add information to its own data and advertising datasets and (ii) shares the identity information with other advertisers during the real-time-bidding delivery of advertisements.

192.    For ads to be delivered as soon as a website user visits a site, multiple technology companies need access to detailed information about the identity and interests of the individual website visitor.

193.    This information is provided by the Partner Pixels, who use Defendant's identity resolution services (which they pay for) to create and expand their own datasets, which they in turn disclose to other players in the real-time-bidding ecosystem as advertisements are delivered on websites.

194.    Each time a user is selected by this network of advertisers to receive an ad, the advertisers "bid" on the user—meaning Defendant or the Partner Pixels are paid for the information they have stored about that user. Millions of these bids are made per day across the internet, demonstrating the immense value of the data Defendant improperly collect on Plaintiffs and Class Members.

195.    As such, the improper collection of vast amounts of data on Plaintiffs and Class Members is done both for Defendant's profit and for the profit of the Partner Pixels.

1

2

## V.    PLAINTIFFS' EXPERIENCES

### A.    Plaintiff Michael Selby

196.    In or about December 2024, Plaintiff Michael Selby visited the Zillow website while in California and searched for properties.

197.    Unbeknownst to Plaintiff Selby, the PubMatic Pixel and the Google Syndication Pixel, among dozens of other pixels, were each loaded onto each page of the website.

198.    When Plaintiff Selby visited the Zillow website, each Partner Pixel called the Lijit Pixel onto the website.  The Lijit Pixel installed multiple tracking cookies cookies onto his browser.

199.    Each Partner Pixel and the Lijit Pixel collected information about Plaintiff Selby's device, browser, and tracked him as he navigated through the website.

200.    Each Partner Pixel, by receiving the full-string URL of each page of the website, intercepted Plaintiff Selby's confidential communications with the Zillow website, including his geographic location and the specific properties that Plaintiff Selby clicked on, viewed, and saved.

201.    These interceptions happened in real time as the information was entered into the Zillow website.

202.    Defendant provided each Partner Pixel with identity resolution services, including Plaintiff Selby's email address, so that each Partner Pixel could deanonymize the data it collected on Plaintiff Selby and sell it during the real-time-bidding process.

203.    That is to say, Plaintiff Selby's personal information was bought by and sold to advertisers such that Plaintiff Selby was served hyper-targeted advertisements.  This was the result of Defendant tracking Plaintiff Selby, de-anonymizing Plaintiff Selby, correlating Plaintiff Selby's information with a profile maintained by Defendant, and providing that profile to other SSPs, DSPs, data brokers, and advertisers.

204.    Defendant also collected information about Plaintiff Selby, including the properties he viewed, his IP address, and fingerprint information about his device and browser, among others.

205.    Defendant compiled this information into a profile on Plaintiff Selby and added the bolstered profile to its suite of data products described above.

206.    Defendant also, by using the cookies loaded onto Plaintiff Selby's browser, tracked his future web browsing activity across the internet and assisted other Partner Pixels in tracking him and wiretapping his communications with websites.

207.    Plaintiff Selby was unaware that Defendant was installing trackers on his browser, aiding in the wiretapping of his communications, deanonymizing his personal data, or collecting, selling, and disclosing his personal data, including data about his living situation, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Selby have discovered these facts.

208.    Plaintiff Selby did not provide his prior consent to Defendant to install trackers on his browser, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data, including data about his living situation, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

209.    Plaintiff Selby has, therefore, had his privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Selby.

**B.    Plaintiff SungGil Hong**

210.    In or about December 2024, Plaintiff SungGil Hong visited the AliExpress website while in California and viewed a bike rack for sale on the website.

211.    Unbeknownst to Plaintiff Hong, the Mediawallah was loaded onto each page of the AliExpress website and called the Lijit Pixel onto each page of the website.

212.    Defendant provided Mediawallah with identity resolution services so that Mediawallah could deanonymize the data it collected on Plaintiff Hong and sell it during the real-time bidding process.

213.    That is to say, Plaintiff Hong's personal information was bought by and sold to advertisers such that Plaintiff Hong was served hyper-targeted advertisements.  This was the result of Defendant tracking Plaintiff Hong, de-anonymizing Plaintiff Hong, correlating Plaintiff Hong's

information with a profile maintained by Defendant, and providing that profile to other SSPs, DSPs, data brokers, and advertisers.

214.    When Plaintiff Hong visited the AliExpress website, The Lijit Pixel installed multiple separate cookies onto Plaintiff Hong's browser.

215.    The Lijit Pixel collected information about Plaintiff Hong, including the webpages he visited, his IP address, and fingerprint information about his device and browser, among others.

216.    Defendant compiled the information it collected into a profile on Plaintiff Hong and added the bolstered profile to its suite of data products described above.

217.    Defendant also, by using the cookies loaded onto Plaintiff Hong's browser, tracked his future web browsing activity across the internet and assisted other Partner Pixels in tracking and wiretapping his communications with websites.

218.    Plaintiff Hong was unaware that Defendant was installing trackers on his browser, collecting his IP address, wiretapping her communications, aiding in the wiretapping of his communications by Partner Pixels, deanonymizing his personal data, or collecting, selling, and disclosing his personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Hong have discovered these facts.

219.    Plaintiff Hong did not provide his prior consent to Defendant to install trackers on his browser, wiretap his communications, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose his personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor did Defendant obtain a court order to do the same.

220.    Plaintiff Hong has, therefore, had his privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Hong.

C.    **Plaintiff Laura Bonetti**

221.    In or about December 2024, Plaintiff Laura Bonetti visited the Bon Appetit website while in California.

222.    Unbeknownst to Plaintiff Bonetti, the Lijit Pixel was loaded onto each page of the website.

223.    Defendant provided Bon Appetit with identity resolution services so that Bon Appetit could deanonymize the data it collected on Plaintiff Bonetti and sell it during the real-time bidding process.

224.    That is to say, Plaintiff Bonetti's personal information was bought by and sold to advertisers such that Plaintiff Bonetti was served hyper-targeted advertisements.  This was the result of Defendant tracking Plaintiff Bonetti, de-anonymizing Plaintiff Bonetti, correlating Plaintiff Bonetti's information with a profile maintained by Defendant, and providing that profile to other SSPs, DSPs, data brokers, and advertisers.

225.    When Plaintiff Bonetti visited the Bon Appetit website, The Lijit Pixel installed multiple separate cookies onto Plaintiff Bonetti's browser.

226.    The Lijit Pixel collected information about Plaintiff Bonetti, including the webpages she visited, her IP address, and fingerprint information about her device and browser, among others.

227.    Defendant shared Plaintiff Bonetti's email address, unique identifiers, previously collected information, and information about which pages of the Bon Appetit website she visited with every Partner Pixel to which it provided identity resolution through the Lijit Pixel.

228.    Defendant compiled the information it collected into a profile on Plaintiff Bonetti and added the bolstered profile to its suite of data products described above.

229.    Defendant also, by using the cookies loaded onto Plaintiff Bonetti's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

230.    Plaintiff Bonetti was unaware that Defendant was installing trackers on her browser, wiretapping her communications, aiding in the wiretapping of her communications by Partner Pixels, deanonymizing her personal data, or collecting, selling, and disclosing her personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant.  Nor could Plaintiff Bonetti have discovered these facts.

231.    Plaintiff Bonetti did not provide her prior consent to Defendant to install trackers on her browser, wiretap her communications, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

232.    Plaintiff Bonetti has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Bonetti.

**D.    Plaintiff Jane Doe**

233.    In or about November 2024, Plaintiff Jane Doe visited the Mindbloom website while in California to find options for ketamine therapy treatment. She had also purchased a ketamine treatment from the Mindbloom website in or about 2021.

234.    Unbeknownst to Plaintiff Doe, the NYTrng Pixel was loaded onto each page of the website and it called the Mediawallah Pixel and Lijit Pixel onto the website.

235.    The Lijit Pixel loaded multiple tracking cookies onto Plaintiff Doe's browser.

236.    Both the Lijit Pixel and the Partner Pixels collected information about Plaintiff Doe's device, browser, and tracked her as she navigated through the website.

237.    The Lijit Pixel also received the URL of each page of the website Plaintiff Doe visited, allowing Magellan to know that Plaintiff Doe sought and purchased prescription ketamine therapy.

238.    Defendant provided the Partner Pixels with identity resolution services so that they could deanonymize the data they collected on Plaintiff Doe and sell it during the real-time-bidding process.

239.    That is to say, Plaintiff Doe's personal information was bought by and sold to advertisers such that Plaintiff Doe was served hyper-targeted advertisements.  This was the result of Defendant tracking Plaintiff Doe, de-anonymizing Plaintiff Doe, correlating Plaintiff Doe's information with a profile maintained by Defendant, and providing that profile to other SSPs, DSPs, data brokers, and advertisers.

240.    Defendant compiled this information into a profile on Plaintiff Doe and added the bolstered profile to Defendant's suite of data products described above.

241.    Defendant also, by using the cookies loaded onto Plaintiff Doe's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

242.    Plaintiff Doe was unaware that Defendant was installing trackers her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, including data about her medication and health status, to advertising technology companies, other data brokers, or any person or entity doing business with Defendants. Nor could Plaintiff Doe have discovered these facts.  Plaintiff Doe did not become aware that she was being tracked on the Mindbloom website and across the internet by Defendant until November 2024.

243.    Plaintiff Doe did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, including data about her medication and health status, to advertising technology companies, other data brokers, or any person or entity doing business with Defendants.  Nor did Defendant obtain a court order to do the same.

244.    Plaintiff Doe has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendants have been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Doe.

245.    Plaintiff Doe has, therefore, had her privacy invaded by Defendant's violations of CIPA §631(a) and § 638.51(a) and Defendants have been unjustly enriched by the sale of the improperly collected data concerning Plaintiff Doe.

**E.    Plaintiff Kirstie Semien**

246.    In or about February 2025, Plaintiff Kirstie Semien visited the Buzzfeed website while in California and selected various articles to read.

247.    Unbeknownst to Plaintiff Semien, the Lijit Pixel and multiple Partner Pixels are loaded onto each page of the website.

248.    The Lijit Pixel collected information about Plaintiff Semien's device, browser, and tracked her as she navigated through the website.

249.    Defendant provided the Partner Pixels with identity resolution services so that those entities could deanonymize the data it collected on Plaintiff Semien, bolster their own data profiles and sell her information during the real-time-bidding process.

250.    That is to say, Plaintiff Semien's personal information was bought by and sold to advertisers such that Plaintiff Semien was served hyper-targeted advertisements.  This was the result of Defendant tracking Plaintiff Semien, de-anonymizing Plaintiff Semien, correlating Plaintiff Semien's information with a profile maintained by Defendant, and providing that profile to other SSPs, DSPs, data brokers, and advertisers.

251.    Defendant also collected information about Plaintiff Semien, including the webpages she visited, her IP address, and fingerprint information about her device and browser, among others.

252.    Defendant compiled this information into a profile on Plaintiff Semien and added the bolstered profile to its suite of data products described above.

253.    Defendant also, by using the cookies loaded onto Plaintiff Semien's browser, tracked her future web browsing activity across the internet and assisted other Partner Pixels in tracking her and wiretapping her communications with websites.

254.    Plaintiff Semien was unaware that Defendant was installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, including data related to insurance, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Semien have discovered these facts.

255.    Plaintiff Semien did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, including data related to insurance, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

256.     Plaintiff Semien has, therefore, had her privacy invaded by Defendant's violations of CIPA §§ 631(a) and 638.51(a), and Defendants have been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Semien.

## CLASS ALLEGATIONS

257.     **Class Definition:** Plaintiffs seek to represent a class of similarly situated individuals defined as follows:

> All persons in the United States whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used by Defendant to create a profile or made available for sale or use through Defendant's Products.

258.     **California Subclass**: Plaintiffs also seek to represent a subclass of similarly situated individuals defined as follows:

> All California citizens whose personal information, communications, or private information, or data derived from their personal information, communications, or private information, was used to create a profile or made available for sale or use through Defendant's Products.

259.     The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

260.     Excluded from the Classes are Defendant, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

261.     **Numerosity**.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are tens or hundreds of millions of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's records and non-party records, such as those of Defendant's customers and advertising partners.

262.   **Typicality**.  Plaintiffs' claims are typical of the claims of the Classes.  Plaintiffs, like all Class Members, had their information collected and made available for sale by Defendant through the use of comprehensive user profiles compiled about Plaintiffs.

263.   **Adequacy**.  Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes.  Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically.  Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

264.   **Commonality/Predominance**.  Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant have acted on grounds generally applicable to the Classes.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Classes include:

(a)   Whether Defendant's acts and practices alleged herein constitute egregious breaches of social norms;

(b)   Whether Defendant acted intentionally in violating Plaintiffs' and Class Members' privacy rights under the California Constitution or common law;

(c)   Whether Defendant were unjustly enriched as a result of their violations of Plaintiffs' and Class Members' privacy rights; and

(d)   Whether Plaintiffs and Class Members are entitled to damages under CIPA or any other relevant statute;

265.   **Superiority**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

Plaintiffs know of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### COUNT I
### Intrusion Upon Seclusion

266. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

267. Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

268. Plaintiffs bring this claim pursuant to California law.

269. To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiffs'] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.'" *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

270. Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

271. By conducting such widespread surveillance, Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion.

272. Plaintiffs and Class Members had a reasonable expectation that their communications, identities, personal activities, health and other data would remain confidential.

273. Plaintiffs and Class Members did not and could not authorize Defendant to intercept data on every aspect of their lives and activities.

274. The conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

(a)  Defendant engages in widespread data collection and interception of Plaintiffs' and Class Members' internet and app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

(b)  Defendant combines the information collected on websites and apps with offline information also gathered on individuals to create the Consumer View and Consumer Sync products.

(c)  Defendant creates comprehensive profiles based on this online and offline data, which violates Plaintiffs' Class Members' common law right to privacy and the control of their personal information.

(d)  Defendant sells or disclose these profiles, which contain the data improperly collected about Plaintiffs and Class Members, to an unknown number of advertisers for use in the real-time-bidding process, which likewise violates Plaintiffs' Class Members' common law right to privacy and the control of their personal information.

275.  Defendant's amassment of electronic information reflecting all aspects of Plaintiffs' and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy in light of the serious risk these profiles pose to their autonomy.

276.  In addition, those profiles are and can be used to further invade Plaintiffs' and Class Members' privacy by, for example. allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

277.  Accordingly, Plaintiff and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

**COUNT II**
**Violation Of The California Invasion of Privacy Act**
**Cal. Penal Code § 631(a)**

278.  Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

279.  Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

280.    The California Legislature enacted the CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

281.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*"  *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted).  This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation *and its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device."  *Id*. at 361 (emphasis added).  Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements."  *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

282.    Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications."  *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022).  Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).  This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA."  *Javier*, 2022 WL 1744107, at *2.  "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

283.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability

under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

284.    To avoid liability under CIPA § 631(a), a defendant must show it had the consent of all parties to a communication, and that such consent was procured prior to the interception occurring.  See *Javier*, 2022 WL 1744107, at *2.

285.    Defendant's various Lijit pixels and SDKs are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

286.    Defendant is "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Defendant has the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators. Accordingly, Defendant was a third parties to any communication between Plaintiffs and California Subclass Members, on the one hand, and any of the websites at issue, on the other.  Id. at 521; see also *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

287.    At all relevant times, Defendant willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents the electronic communications of Plaintiffs and California Subclass Members, on the one hand, and the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

288.    At all relevant times, Defendant uses those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale in real-time bidding to prospective advertisers.

289.    Plaintiffs and California Subclass Members did not provide their prior consent to Defendant's intentional interception, reading, learning, recording, collection, and usage of Plaintiffs' and California Subclass Members' electronic communications.

290.    The wiretapping of Plaintiffs and California Subclass Members occurred in California, where Plaintiffs and California Subclass Members accessed the websites, where Defendant's Lijit pixels were loaded on Plaintiffs' and California Subclass Members' browsers, and where Defendant routed Plaintiffs' and California Subclass Members' electronic communications to Defendant's servers.

291.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT III**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 638.51(a)**

292.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

293.    Plaintiffs bring this claim individually and on behalf of the proposed California Subclass against Defendant.

294.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

295.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

296.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

297.    In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

298.    For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

299.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology has advanced, however, courts have expanded the application of these surveillance devices. This, combined with the California Supreme Court's mandate to read provisions of the CIPA broadly to protect privacy rights, has led courts to apply CIPA § 638.50 to internet tracking technologies similar to the Defendant's technologies at issue here. *See*, *e.g.*, *Shah v. Fandom, Inc.*, --- F. Supp. 3d ---, 2024 WL 4539577, at *21  (N.D. Cal. Oct. 21, 2024) (finding trackers were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.*, --- F. Supp. 3d ---, 2024 WL 3561367, at *3 (C.D. Cal. July 25, 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects

information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software provided by data broker was a "pen register").

300.    The Lijit pixels and the cookies Sovrn installed on Plaintiffs' and California Subclass Members' browsers, to the extent they do not intercept "contents" of communications as defined in CIPA § 631(a), are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the IP address, geolocation, device information, and other persistent identifiers—from the electronic communications transmitted by Plaintiffs' and California Subclass Members' computers or smartphones.  Cal. Penal Code § 638.50(b); see also *Shah*, 2024 WL 4539577, at *3; *Mirmalek*, 2024 WL 4102709, at *3.

301.    At all relevant times, Defendant installed the Lijit pixels and cookies—which are pen registers—on Plaintiff's and California Subclass Members' browsers, which enabled Defendant to collect Plaintiff's and California Subclass Members' IP addresses, geolocation, device information, and other persistent identifiers from the websites they visited.  Defendant then used the Lijit pixels and cookies to build comprehensive user profiles, which were used to unjustly enrich Defendant and its clients by linking and enhancing Plaintiff's and California Subclass Members' data when it is provided to advertisers through the real-time bidding process.

302.    Plaintiffs and California Subclass Members did not provide their prior consent to Defendant's installation or use of the Lijit pixels, cookies, and other tracking technology at issue.

303.    Defendant did not obtain a court order to install or use the Lijit pixels, cookies, and other tracking technology at issue.

304.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and California Subclass Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## COUNT IV
## Unjust Enrichment

305.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

306.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant Sovrn, Inc., and on behalf of the California Subclass against Defendant Sovrn, Inc.

307.    In both cases, Plaintiffs bring this claim pursuant to California law.

308.    Defendant has wrongfully and unlawfully trafficked in the named Plaintiffs' and Class Members' personal information and other personal data without their consent for substantial profits.

309.    Plaintiffs' and Class Members' personal information and data have conferred an economic benefit on Defendant, which was collected and used by Defendant without consent.

310.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class Members, and have unjustly retained the benefits of their unlawful and wrongful conduct.

311.    It would be inequitable and unjust for Defendant to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

312.    Plaintiffs and Class Members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Defendant obtained as a result of their unlawful and wrongful conduct.

313.    When a defendant is unjustly enriched at the expense of a plaintiff, the plaintiff may recover the amount of the defendant's unjust enrichment even if plaintiff suffered no corresponding loss, and plaintiff is entitled to recovery upon a showing of merely a violation of legally protected rights that enriched a defendant.

314.    Defendant has been unjustly enriched by virtue of their violations of Plaintiffs' and California Class members' legally protected rights to privacy as alleged herein, entitling Plaintiffs and California Class members to restitution of Defendant's enrichment. "[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss." RESTATEMENT (THIRD) OF RESTITUTION § 1, cmt. a.

315.    Defendant was aware of the benefit conferred by Plaintiffs. Indeed, Defendant's data-brokerage products are premised entirely on the sale of such data to third parties. Defendant therefore acted in conscious disregard of the rights of Plaintiffs and Class and California Subclass Members

and should be required to disgorge all profit obtained therefrom to deter Defendant and others from committing the same unlawful actions again.

**COUNT V**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1), *et seq***

316.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

317.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant and on behalf of the California Subclass against Defendant.

318.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

319.    The ECPA protects both sending and the receipt of communications.

320.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

321.    The transmission of Plaintiffs' website page visits, selections, bookings, appointment information, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

322.    The transmission of this information between Plaintiffs and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

323.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

324.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

325.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

326.    The following instruments constitute "devices" within the meaning of the ECPA:

a)    The Lijit Pixel, and any other tracking code or SDK used by Defendant; and

b)    Each Partner Pixel;

327.    Plaintiffs and Class Members' interactions with each website are electronic communications under the ECPA.

328.    By utilizing the Lijit Pixel, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

329.    Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiffs and Class members regarding their health, travel, shopping habits, consumption of media, geolocation, and many more.  This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

330.    By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

331.    Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

332.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy."

*Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

333.   Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

334.   Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy.  Plaintiff and Class members had a reasonable expectation that Defendant would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

335.   The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

336.   As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiffs seek statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all Class Members, seek judgment against Defendant, as follows:

(a)   For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiffs as the representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes.

(b)   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(c)   For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(d)   For pre- and post-judgment interest on all amounts awarded; and

(e)   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

1    Dated:  April 7, 2025                    Respectfully submitted,

2                                            **BURSOR & FISHER, P.A**.

3                                            By: */s/ Philip L. Fraietta*
                                                 Philip L. Fraietta

4

5                                            Philip L. Fraietta (State Bar No. 354768)
                                             Max S. Roberts (*Pro Hac Vice* Forthcoming)
                                             Victoria X. Zhou (*Pro Hac Vice* Forthcoming)
6                                            1330 Avenue of the Americas, 32nd Floor
                                             New York, NY 10019
7                                            Telephone: (646) 837-7150
                                             Facsimile:  (212) 989-9163
8                                            Email: pfraietta@bursor.com
                                                     mroberts@bursor.com
9                                                    vzhou@bursor.com

10                                           **BURSOR & FISHER, P.A.**
                                             Joshua R. Wilner (State Bar No. 353949)
11                                           1990 North California Blvd., 9th Floor
                                             Walnut Creek, CA 94596
12                                           Telephone: (925) 300-4455
                                             Facsimile:  (925) 407-2700
13                                           E-mail: jwilner@bursor.com

14                                           *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28